E-FILED
Friday, 25 October, 2019 11:01:03 AM
Clerk, U.S. District Court, ILCD

Mathew K. Higbee, Esq.
Naomi M. Sarega, Esq.
Ryan E. Carreon, Esq.
**HIGBEE & ASSOCIATES**
1504 Brookhollow Dr., Suite 112
Santa Ana, CA 92705
(714) 617-8352
(714) 597-6559 facsimile
Email: mhigbee@higbeeassociates.com

Attorney for Plaintiff,
*ADLIFE MARKETING &*
*COMMUNICATIONS CO. INC.,*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| ADLIFE MARKETING & COMMUNICATIONS CO. INC., <br><br>             Plaintiff, <br><br> v. <br><br> FAREWAY STORES, INC., <br><br>             Defendant. | Case No.: 4:17-CV-04254-SLD-JEH <br><br> **DECLARATION OF RYAN E. CARREON** |

## <u>DECLARATION OF RYAN E. CARREON</u>

I, Ryan E. Carreon, declare as follows:

1.     I am over the age of 18 years old. I am an attorney at law admitted to practice in the Central District of Illinois. I have personal knowledge of all matters stated herein, and if called as a witness, I could and would competently testify thereto.

2.     I am the attorney for Plaintiff Adlife Marketing & Communications Co. Inc. in the above captioned matter.

3.     On August 3, 2018, Adlife served Fareway its initial disclosures. As part of its disclosures, Adlife identified Sharon Albrizio as a person possessing potentially discoverable information.

4.     Sharon Albrizio is the same person identified by Fareway as Sharon Ferretti. At the time the initial disclosures were served, Ms. Ferretti was employed by Adlife as an officer and was married to Adlife president Joel Albrizio, which is why she is identified with the last name Albrizio.

5.     Attached hereto as Exhibit A is a true and correct copy of Adlife's initial disclosures served in Fareway in this matter.

6.     In addition to being identified in Adlife's initial disclosures, Ms. Ferretti's name appears on a number of documents disclosed by Adlife in discovery, including emails, corporate filings, and other documents.

7.     Therefore Fareway was clearly on notice of Ms. Ferretti's existence and her involvement in many matters relevant to this litigation.

8.     Until recently, Ms. Ferretti was employed by Adlife as an officer of the company. However, earlier this year, Ms. Ferretti was fired from Adlife for stealing confidential financial documents among other things, and is currently involved in a contentious lawsuit with Adlife regarding her termination which is currently pending in Rhode Island state court.

9.     On June 22, 2018, while employed by Adlife, Ms. Ferretti gave a deposition under penalty of perjury in a matter in which Adlife was a defendant.

10.     During the deposition, Ms. Ferretti was question under oath about much of the same subject matter included in her declaration submitted with Fareway's Motion.

11.    Attached hereto as Exhibit B are true and correct excerpts of Ms. Ferretti's deposition. Due to confidentiality of the other party to the litigation, I have redacted reference to their identities from the excerpted transcript.

12.    As Fareway's instant Motion demonstrates, it has not acted with diligence with respect to discovery matters in this litigation.

13.    Despite having nearly a full year to take discovery, Fareway served its first set of discovery requests on May 21, 2019, only 30 days before the discovery cut-off date.

14.    The parties then mutually agreed to extend the scheduling order by 90 days with the promise that Fareway would attend a mediation on or before September 1, 2019. The new fact discovery cutoff was set for September 23, 2019.

15.    On August 27, 2019, Fareway noticed the depositions of Adlife, Joel Albrizio, and Douglas Fleurant to take place the second week of September.

16.    Despite being identified on Adlife's initial disclosures, Fareway's counsel never inquired with anyone from my firm as to Ms. Ferretti or her availability for deposition.

17.    The depositions took place on September 10 and 11 respectively.

18.    During the depositions, Adlife's witnesses testified that Ms. Ferretti had been previously married to Adlife president Joel Albrizio, testified as to her role with Adlife when she was an officer, testified that during the pendency of the litigation she had been fired from Adlife for stealing confidential financial documents among other things, and also

testified that she had recently sued Adlife in connection with her termination from the company.

19.    Despite being on notice for over a year that Ms. Ferretti possessed potentially discoverable information and despite having a detailed understanding of Ms. Ferretti's role at Adlife by virtue of the depositions, and being given all the information necessary during the depositions to be able to locate and subpoena Ms. Ferretti for information prior to the September 23 discovery cutoff, Fareway apparently sat on its druthers and did nothing.

20.    It would not have been difficult for Fareway to locate and contact Ms. Ferretti and arrange for a deposition to take place prior to the September 23, discovery cut off. For example, the top Google search result for Ms. Ferretti under both her maiden and married names would direct a user to Ms. Ferretti's LinkedIn page where she could be easily contacted.

21.    Furthermore, during the depositions of Adlife's witnesses, Fareway was informed of the litigation currently pending between Ms. Ferretti and Adlife and obtained from the testimony given all the information necessary to be able to locate the case on the Rhode Island state court docket, which would contain the contact information for Ms. Ferretti's attorneys.


I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 25, 2019, at Santa Ana, California.

_____

Ryan E. Carreon

# Exhibit "A"

Mathew K. Higbee, Esq., SBN 6319929
Naomi M. Sarega, Esq.
**HIGBEE & ASSOCIATES**
1504 Brookhollow Dr., Suite 112
Santa Ana, CA 92705
(714) 617-8352
(714) 597-6559 facsimile
Email: mhigbee@higbeeassociates.com

Attorney for Plaintiff,
ADLIFE MARKETING & COMMUNICATIONS Co.
INC.,

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| ADLIFE MARKETING & COMMUNICATIONS Co. INC., <br><br> Plaintiff, <br><br> v. <br><br> FAREWAY STORES, INC., <br><br> Defendant. | Case No.: 4:17-cv-04254-SLD-JEH <br><br> **PLAINTIFF'S RULE 26(a) INITIAL DISCLOSURES** |

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD HEREIN:

Pursuant to Federal Rule of Civil Procedure 26(a)(1), Plaintiff ADLIFE

MARKETING & COMMUNICATION CO., INC ("Adlife") makes the following

initial disclosures. These disclosures are made based on the information reasonably

available to Adlife as of the date of execution of these disclosures. Adlife's disclosures represent a good faith effort to identify individuals and documents that it reasonably believes are relevant to those disputed facts that are alleged with particularity in the pleadings.

By identifying individuals who are likely to have discoverable information relevant to the disputed facts alleged with particularity in the pleadings, Adlife is not representing that the identified individuals necessarily possess personal knowledge of such information. Further, in making these disclosures, Adlife does not represent that it is identifying every document, tangible thing, or witness that possibly is or may become relevant to this lawsuit. Adlife reserves the right to object to the production of documents or tangible things disclosed herein on the basis of privilege, the work product doctrine, relevancy, undue burden, non-existence, lapse in time, or any other valid objections. Adlife further reserves the right to supplement these disclosures as the parties proceed with further discovery and investigation in this case.

Adlife's disclosures are made without waiving: (1) the right to object on the grounds of competence, privilege, relevance, materiality, hearsay or any other proper ground to the use of this information, for any purpose, in whole or in part, in any subsequent proceeding in this action or any other action; and (2) the right to object on any and all grounds, at any time, to any other discovery requests or

proceeding involving or relating to the subject matter of these disclosures.

## I.      Individuals Likely to Have Discoverable Information

Pursuant to Fed. R. Civ. P. 26(a)(1)(A)(i), Adlife discloses the following individuals likely to have discoverable information that may be used to support Adlife's claims. Adlife reserves the right to amend or supplement these disclosures, including as provided by Fed. R. Civ. P. 26(e). The following disclosures do not include persons whose testimony is likely to be used solely for impeachment, rebuttal, or expert witness testimony, who will be disclosed in accordance with the schedule set by the Court or the Federal Rules of Civil Procedure:

1.      Joel Albrizio, president of Adlife, c/o Higbee & Associates, 1504 Brookhollow Drive, #112, Santa Ana, CA 92705;

2.      Sharon Albrizio, executive vice president of Adlife, c/o Higbee & Associates, 1504 Brookhollow Drive, #112, Santa Ana, CA 92705;

3.      Doug Fleurant, chief financial officer of Adlife, c/o Higbee & Associates, 1504 Brookhollow Drive, #112, Santa Ana, CA 92705.

4.      Adlife's representative(s) are likely to have discoverable information regarding the issues involved in this dispute. With respect to the scope of discoverable information provided by Adlife' representatives, each has corresponded with Adlife in regards to the subject matter at hand. In addition, they

are likely to have discoverable information regarding the day-to-day business activities and functions of Adlife.

5. All individuals identified by FAREWAY STORE, INC. ("Fareway"), in any of its pleadings or disclosures.

Adlife reserves the right to supplement the above disclosure as a result of its continuing investigation and discovery.

## II. Description of Documents and Things in Adlife's Possession, Custody, or Control That May Be Used to Support Adlife's Claims

Pursuant to Fed. R. Civ. P. 26(a)(1)(A)(ii), Adlife hereby discloses the following documents and things in its possession, custody or control that it may use to support its claims. Adlife reserves the right to amend or supplement these disclosures as provided under Fed. R. Civ. P. 26(e). The following disclosures do not include documents and things that are likely to be offered solely for impeachment:

1. Documents demonstrating Fareway's unauthorized use of Adlife's Copyrighted Food Photographs;

2. Adlife's copyright registrations with U.S. Copyright Office regarding the Copyrighted Food Photographs;

3. Adlife and its counsel's correspondence with Fareway and its employees and agents regarding Adlife's claims against Fareway.

4. Adlife reserves the right to supplement the above disclosure as a result

of its continuing investigation and discovery.

## III.    Computation of Damages

Pursuant to Fed. R. Civ. P. 26(a)(1)(A)(iii), Adlife discloses that it is entitled to recover damages in the form of, *inter alia*, actual damages and Defendant's profits or statutory damages pursuant to 17 U.S.C. § 504(b) and (c) at Adlife's election, attorneys' fees and costs pursuant to 17 U.S.C. § 505, and interest based on Adlife's claims. Adlife anticipates that damages calculations will depend upon expert analyses and testimony to be developed and disclosed according to the schedule set by the Federal Rules of Civil Procedure and the Court. Subject to the foregoing, Adlife has certain financial and other records that may be relevant to damages calculations.

## IV.    Insurance Disclosure

Adlife is not currently aware of any insurance agreement that may be responsive to Fed. R. Civ. P. 26(a)(1)(A)(iv), but will supplement this response if such an agreement is subsequently discovered.

## V.    Reservation of Rights

Adlife reserves the right to amend or supplement these disclosures as provided by Fed. R. Civ. P. 26(e) and to object to the admissibility of any document or statement herein or in Defendant's initial disclosures on all bases set forth in the Federal Rules of Civil Procedure, Federal Rules of Evidence, and governing law.

Dated: August 3, 2018                    Respectfully submitted,


                                         **/s/ Mathew K. Higbee**
                                         Mathew K. Higbee, Esq., SBN 6319929
                                         Naomi M. Sarega, Esq.
                                         **HIGBEE & ASSOCIATES**
                                         1504 Brookhollow Dr., Suite 112
                                         Santa Ana, CA 92705
                                         (714) 617-8352
                                         (714) 597-6559 facsimile
                                         Email: mhigbee@higbeeassociates.com
                                         *Counsel for Adlife*

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2018, I served the following document:

**PLAINTIFF'S RULE 26 DISCLOSURES**

via electronic mail to the addresses as follows:

Siobhan M. Murphy
LEWIS BRISBOIS BISGAARD & SMITH, LLP.
550 West Adams Street,
Suite 300
Chicago, IL 60661
Siobhan.murphy@lewisbrisbois.com
*Counsel for Defendant, FAREWAY STORES, INC.*

I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on August 3, 2018, at Santa Ana, California.

*/s/ Naomi M. Sarega*
Naomi M. Sarega, Esq.
*Counsel for Plaintiff*

# Exhibit "B"

1          UNITED STATES DISTRICT COURT

2

3        CIVIL ACTION NO.:

4

5    *****************************************

6                                        *

7              PLAINTIFF                 *

8                                        *

9    v.                                  *

10                                       *

11   ADLIFE MARKETING &                  *

12   COMMUNICATIONS CO., INC.,           *

13              DEFENDANT                 *

14                                       *

15   *****************************************

16

17        DEPOSITION OF:   SHARON ALBRIZIO

18        ADLER, POLLOCK & SHEEHAN, P.C.

19        One Citizens Plaza, 8th Floor

20          Providence, Rhode Island

21        June 22, 2018    9:25 a.m.

22

23

24          Pauline L. Bailey

25          Professional Reporter

1    Jeremy put these together?

2         A.    I have no idea.

3         Q.    Do you know if anyone at Adlife put

4    these together though?

5         A.    That, I don't know.

6         Q.    All right.  Because it has the

7    Adlife, I see the Adlife masthead on top and all

8    that.

9         A.    Uh-huh.

10        Q.    All right.  So have you ever seen

11   documents like this before the deposition?

12        A.    No, not unless -- no, actually.  No,

13   these -- these I have not.

14        Q.    Okay.  So, at the outset today you

15   mentioned that you're -- you have -- you're aware

16   of the copyright registrations?

17        A.    Yes.

18        Q.    Okay.  And -- and I know we saw them

19   yesterday.  Have you seen them before yesterday?

20        A.    I know -- I know that we -- we've

21   copyrighted our entire library.

22        Q.    Yeah.

23        A.    I haven't actually seen the copyright

24   registrations.

25        Q.    Okay.  And so, but so, was -- was --

1        A.    I believe it was 2016.  Two years

2   ago.

3        Q.    And I think there was a -- Joel

4   mentioned that there was a developer who put

5   together the architecture for that?

6        A.    Rich Anderson.

7        Q.    Okay.  And then as far as content

8   goes, did you have any involvement in putting

9   content on that?

10       A.    No.

11       Q.    Okay.  And so, when the website was

12  going up, you said -- it's your understanding that

13  the company thought they'd better get some

14  copyright protection in place?

15       A.    I think, yeah, exactly.

16       Q.    Okay.  And the -- the company's image

17  library tough existed long before 2016, right?

18       A.    Absolutely.

19       Q.    Okay.  You heard us talking yesterday

20  about applications for these registrations,

21  correct?

22       A.    Uh-huh.

23       Q.    Okay.  What is your knowledge about

24  the application process at all?

25       A.    I have nothing -- I have no idea.  I

1    have no knowledge of that.

2          Q.    All right.

3          A.    I did not participate in any of that.

4    I have no idea.

5          Q.    And I -- I know you've said that

6    you've seen some registrations.  Have you ever seen

7    any application materials?

8          A.    No.

9          Q.    So, is there any -- so in putting --

10   in putting together these registrations is there

11   any role you had whatsoever?

12         A.    No.

13         Q.    Okay.  Were you consulted about, you

14   know, this is how we're going to do this

15   registration?

16         A.    No.

17         Q.    Okay.  But you knew it was going to

18   happen?

19         A.    Uh-huh.

20         Q.    Okay.

21         A.    Yes, exactly.

22         Q.    But I presume you were on board?

23         A.    Yes.

24         Q.    All right.  Now, we talked, you know,

25   with -- with Joel at length yesterday about his

1    photography experience.  Do you recall that?

2         A.    Uh-huh.

3         Q.    What is your --

4         A.    Yes.

5         Q.    What is your knowledge of Joel's

6    photography experience?

7         A.    I don't know extensively what

8    knowledge you would be asking me about.  I mean, I

9    don't know, as a graphic designer I didn't cross

10   paths with the photographers when I was a graphic

11   designer.  So, I don't know.

12        Q.    So, you recall though, you know, when

13   -- when you started with the company, ever seeing

14   Joel taking photos?

15        A.    Yes, I did see him in the photo

16   studio.  When graphic designers would basically run

17   through the process, the graphics department, we

18   would sketch out what we would want to have shot

19   and we would size it, we would sketch it out.  We

20   would put that paperwork into -- we would submit it

21   to the kitchen or the photography department and it

22   would go through there.  We wouldn't really see it

23   until we got proof of what the picture or image was

24   at that time.  It would usually be a day or two

25   later.  And that was kind of it.  So, you didn't

1    really see, it was a completely different

2    department separate and apart from artists.  So, we

3    really didn't see what went on behind the scenes in

4    a sense.

5         Q.    Yeah.

6         A.    There were a few times I was, you

7    know, I would be back there and Joel would be back

8    there with the photographers and they would be

9    shooting pictures.

10         Q.    So, you said Joel back there with the

11    photographers.

12         A.    As a photographer, you know, with the

13    photography...

14         Q.    Now, you mentioned the photo studio.

15         A.    Uh-huh.

16         Q.    Is that actually -- that was yes?

17         A.    Yes.

18         Q.    That's actually -- that's actually in

19    the office?

20         A.    That was years ago in a different

21    office location.

22         Q.    Is it now -- when would that have

23    been?

24         A.    '94 to 2000 -- I mean, I don't know

25    prior, because I started -- I should say '95.  I

Sharon Albrizio
June 22, 2018                                    40

1   started in '95.  I don't know how long prior to
2   that because I didn't work there before then.
3          Q.    Right.  Now, you --
4          A.    We moved to Pawtucket five years ago.
5          Q.    So, was it in Massachusetts before?
6          A.    Uh-huh.
7          Q.    Okay.  Now, you -- you said -- you
8   did say '94 first, correct?
9          A.    Yes.
10         Q.    And why do you say '94?
11         A.    Well, because I know that the company
12  was there in '94, Adlife.
13         Q.    And I think you -- I heard you say
14  that the -- that the graphic designers would put
15  together what they wanted to see, right?
16         A.    Yeah.
17         Q.    That includes what they wanted to see
18  in a picture?
19         A.    Yes, they would sketch out what they
20  wanted, like what -- say if we had a Thanksgiving
21  dinner.
22         Q.    Yeah.
23         A.    And that was going to be a front
24  page, and we sketched out the entire image of what
25  you wanted and where the text box would go for the

```
 1   he didn't just -- it wasn't, okay, I'm going to

 2   team up with Joel this week and do all of my

 3   photography.  It's not -- that's not how it ran,

 4   that's not how the department business ran.

 5         Q.    Are you aware of other graphic

 6   designers though who actually did do those things

 7   for --

 8         A.    No, no.

 9         Q.    But it could have happened?

10         A.    Oh, absolutely.

11         Q.    How many cameras does Joel have now?

12         A.    I want to say two, maybe three.

13         Q.    Two or three.  Do you know what kind

14   they are, digital or film?

15         A.    Digital.

16         Q.    Okay.  What equipment does he have

17   around the house?

18         A.    Just -- not -- I mean, you don't

19   really need -- now.  But digital and lighting.  And

20   that's about it.

21         Q.    But what do you mean lighting?

22         A.    You need, there's -- I mean, I don't

23   know how to explain photography equipment.  But,

24   you know, the big, I don't know, I don't know how

25   to explain.
```

Sharon Albrizio
June 22, 2018                                    44

1          Q.     One of those screens you put?
2          A.     Yeah -- no, I don't know how -- I
3    don't know how to explain it to you.
4          Q.     Some kind of light you would -- for
5    lighting, you know, is that --
6          A.     It's like a -- like a plastic --
7    there's a name for it and I can't think of it.  But
8    it's just a big thing.
9          Q.     Some sort of lighting equipment?
10         A.     Photographer's lighting.  How's that?
11         Q.     That's good -- that's good enough for
12   me.
13         A.     You know.
14         Q.     Yeah, good enough for me.  Take a
15   quick look, if you will, at Exhibit 10.  Got that
16   one?
17
18          Do you -- do you recognize those?
19         A.     I recognize them as Adlife images.  I
20   don't know other than that.
21         Q.     Okay.  And so, you had no role in
22   selecting these images I take it?
23         A.     No.
24         Q.     Do you know if any of these images
25   were ones that you helped to design?

```
 1        A.    Uh-huh.
 2        Q.    So, how would you know what to send
 3   Christina to demonstrate ownership of the image?
 4        A.    I would say looking at the next page
 5   that I probably called Doug and asked him to get me
 6   what I needed, to be honest with you.
 7        Q.    Okay.  So, because --
 8        A.    Because I didn't know.
 9        Q.    Okay.  So -- so the -- the -- there's
10   an e-mail from Doug on the next page, page 22,
11   which is to you.  And so you would have called Doug
12   to say what do I do here?
13        A.    Yeah.
14        Q.    Okay.  And then --
15        A.    It appears that way.
16        Q.    Okay.  And then so to -- how -- how
17   about the, you know, forwarding the other images
18   Adlife has found to be out of license, how would
19   you know that?
20        A.    That would have been the attachments
21   that Doug sent to me.
22        Q.    Okay.  So, again it was -- it was --
23        A.    Yes.
24        Q.    -- Doug.  You had to go to Doug for
25   this information?
```

1          Q.    All right.  He -- Joel asks you and

2    Doug to provide Peter with copyright information

3    for the -- for the images involved in the

4              files for images known to be the

5    property of Adlife.  Do you see that?

6          A.    Uh-huh.

7          Q.    Why -- why would he -- Joel refer to

8    images known to be the property of Adlife?

9          A.    I have no idea.  I'm not aware of any

10   images that we possess that are not Adlife images.

11   So, I -- I don't know what Joel's thinking was.

12         Q.    Okay.  That's my question.  Are you

13   aware of Adlife actually possessing images that it

14   didn't own?

15         A.    Not one.  So, I don't know what

16   Joel's thought process was there.

17         Q.    Okay.  And he also says, "Please

18   provide Peter copyright information only on the

19   photographs belonging to Adlife."  Do you see that?

20         A.    I do.

21         Q.    Okay.  And again, do you not know why

22   he is saying only on the photographs that we own?

23         A.    I have no idea.

24         Q.    All right.  So -- well, let me ask

25   you this.  How would you know -- how would you know

1    images that were known to be the property of

2    Adlife, how would you personally know that?

3         A.    We -- for the 23 years I've worked at

4    the company, we take pride in the fact that we have

5    built our own photography library.  And it's the

6    only library of its kind.  And we've never

7    purchased an image.  We pride ourselves on that.

8    We've never purchased an image from anybody.  Every

9    single image that we have, we have created

10   ourselves.

11        Q.    So you -- so you --

12        A.    I'll stand by that, yes.  I

13   absolutely, that's why I'm not sure why Joel would

14   have, you know, written that e-mail that way.

15        Q.    What was your involvement in the

16   putting together of the library you're talking

17   about?

18        A.    I really didn't have any involvement

19   in creating that library.

20        Q.    Okay.  So, you don't know exactly

21   what has gone into that library over the entire

22   duration; is that fair to say?

23        A.    That's fair.

24        Q.    Okay.  So, when you say we've never

25   put an image in there that we bought or otherwise

1    didn't own, do you know that personally for a fact?

2         A.    No, I can't, I'm not a hundred

3    percent.  I stand by the company and what -- what

4    we, you know, what we would have stated.  And what

5    -- I would swear by that a hundred percent.

6         Q.    Okay.  That's what you believe then?

7         A.    Absolutely.  It's what I believe.

8         Q.    Got you.  So, on page 35 of this,

9    bottom of the page, Doug -- Doug weighs in.  This

10   is September 20, it's the day after the e-mail from

11   Joel we just talked about.  And he e-mails you and

12   -- you and Joel, just to give you an update.  And

13   he says Jeremy is in the process of putting

14   together a               PDF file with images he

15   knows we own.  Do you see that?

16        A.    Uh-huh.

17        Q.    So, again --

18             THE COURT REPORTER:  Is that yes?

19        A.    Yes.  Sorry.

20        Q.    (By Mr. Borick)  Jeremy was the guy

21   we talked about before?

22        A.    Yes.

23        Q.    Howard, correct?

24        A.    Yes.

25        Q.    And again, there's that phrase, with

Page 104

1       I, PAULINE L. BAILEY, Commissioner, do

2   hereby certify that, Sharon Albrizio, appeared

3   before me and satisfactorily identified herself on

4   the 22nd day of June, at Adler Pollock & Sheehan,

5   P.C., One Citizens Plaza, 8th Floor, Providence,

6   Rhode Island, and was by me duly sworn to testify

7   to the truth and nothing but the truth as to her

8   knowledge touching and concerning the matters in

9   controversy in this cause; that she was thereupon

10  examined upon her oath and said examination reduced

11  to writing by me; and that the statement is a true

12  record of the testimony given by the witness, to

13  the best of my knowledge and ability.

14          I further certify that I am not a

15  relative or employee of counsel/attorney for any of

16  the parties, nor a relative or employee of such

17  parties, nor am I financially interested in the

18  outcome of the action.

19

20

21          WITNESS MY HAND this 10th day of

22  July, 2018.

23

24  Pauline L. Bailey             My commission expires:

25  Commissioner                  April 30, 2020